MISSISSIPPI SHIPBUILDING CORPORATION, Appellant, *v.*
LEVER BROTHERS COMPANY et al., Respondents.

Contract — provision in shipbuilding contract that change
in plans must be in writing — departure from plans in material
respects without written authorization — purchaser may either
refuse acceptance or take vessel and pay difference between
amount due on contract and damage sustained from departure
from plans — when service of answer and bill of particulars
sufficient notice of breach of warranty under section 130 of
Personal Property Law — sufficiency of allegations of complaint
to permit proof of waiver — erroneous admission of hearsay
evidence.

1. Where, in an action to recover a balance claimed to be due
under a shipbuilding contract which contained a provision that any
changes in the plans or specifications should be in writing it appears
that in the building of the vessel the plans were departed from in a
material and substantial respect without written authorization result-
ing in damage to defendant, a holding that the plaintiff could recover
nothing for its work and material furnished would be correct if defend-
ant had rejected the ship and returned it to the plaintiff, but, where
it has accepted the ship, it cannot keep it and refuse to pay plaintiff
the balance due it over and above the damage sustained. A dis-
missal of the complaint was, therefore, error, but defendant, upon
giving the notice required by section 130 of the Personal Property
Law (Cons. Laws, ch. 41) would be entitled to offset his damage
caused by the departure from the plans against the plaintiff's claim
under his contract.

2   Mississippi Shipbuilding Corp. *v.* Lever Bros. Co.

[237 N. Y. 1]                Statement of case.                [Nov.,

2. Where the vessel set out upon its trial trip in September, 1918, and did not return until March, 1919, when the alleged defects and departures from the contract were discovered, and this action was commenced February 6, 1919, the service of the answer and bill of particulars on March 12, 1919, calling attention to the change in construction was sufficient notice of a breach of the plaintiff's warranty, within section 130 of the Personal Property Law, provided that the first knowledge that the defendant had of the defective and faulty work was upon the return and examination of the ship.

3. Allegations in the complaint that the plans had been changed and the performance of all the requirements waived by the defendant were sufficient to enable the plaintiff to prove a waiver of the plans as stated in the bill of particulars and that defendant or its authorized agent had changed the form of construction, but an examination of the proof shows that defendant's agents at the shipyard had no authority to make the change.

4. Where the question whether the alteration in the plans caused damage to the ship was strongly contested, it being claimed by plaintiff that cargo improperly loaded had caused such damage, the admission of hearsay evidence bearing upon the question constitutes reversible error.

*Mississippi Shipbuilding Corp.* v. *Lever Bros. Co.*, 205 App. Div. 569, reversed.

(Argued October 11, 1923; decided November 20, 1923.)

Appeal from a judgment, entered May 25, 1923, upon an order of the Appellate Division of the Supreme Court in the first judicial department reversing a judgment in favor of plaintiff entered upon a verdict and directing a dismissal of the complaint.

*Maxwell Slade, I. Maurice Wormser* and *Leonard Acker* for appellant. The complaint specifically alleges, and throughout proceeds on the theory, that strict performance of the letter of the contract was waived. (*Berkshire Cotton Mfg. Co.* v. *Cohen*, 236 N. Y. 364.) Plaintiff proved a full performance of the contract, within the fair contemplation of the parties. (*Condict* v. *Onward Const. Co.*, 210 N. Y. 88.) In any case, the Appellate Division should not have dismissed the complaint, but

should have ordered a new trial. (*New* v. *Village of New Rochelle*, 158 N. Y. 41; *Lopez* v. *Campbell*, 163 N. Y. 340.)

*Albert Stickney* and *Hersey Egginton* for respondents. The allegation in the complaint that the plaintiff duly performed the contract finds no support in the evidence, and the Appellate Division properly held that the proof was not in conformity with the pleadings and that the complaint should be dismissed. (*Walrath* v. *Hanover Fire Ins. Co.*, 216 N. Y. 220; *Southwick* v. *First National Bank*, 84 N. Y. 420; *Romeyn* v. *Sickles*, 108 N. Y. 650; *Brightson* v. *Claflin Co.*, 180 N. Y. 76; *Schnaier* v. *Nathan*, 31 App. Div. 225; *Oakley* v. *Morton*, 11 N. Y. 25; *Weeks* v. *O'Brien*, 141 N. Y. 199; *Granger Co.* v. *B. K. Iron Works*, 204 N. Y. 218; *Winter* v. *City of Niagara Falls*, 190 N. Y. 198; *Rosenthal P. Co.* v. *Nat. F. B. & P. Co.*, 226 N. Y. 313.) Whether the second cause of action be considered to proceed on the theory of a recovery of the contract price of the additional work and material alleged to have been ordered by defendants, or whether on the theory of *quantum meruit*, the failure to prove due performance of the contract under an allegation of due performance is equally fatal to the recovery. (*Steel S. & E. Co.* v. *Stock*, 225 N. Y. 173; *Smith* v. *Brady*, 17 N. Y. 173; *Exeter Machine Works* v. *Wonham-Magor Engineering Works*, 134 App. Div. 386; *Tinley* v. *Van Wert*, 119 App. Div. 738.)

CRANE, J. On the 25th day of January, 1918, the Mississippi Shipbuilding Corporation, a corporation organized and existing under the laws of the state of Delaware with offices at 32 Broadway, New York city, and Lever Brothers Company, a corporation organized and existing under the laws of the state of Maine, represented by W. H. Woolner, its agent and attorney in fact, entered into a written agreement for the building and purchase of a

four-masted auxiliary schooner of about 1,500 English tons total deadweight to be completely equipped in all respects, ready for sea, except as to stores, and free of and from all liens, claims and incumbrances. The ship was to be built at the shipyards of the builder at Biloxi, Mississippi. The contract provided that:

" Said schooner shall be approximately 193 feet over all, 37 feet beam, 18 feet moulded depth, equipped with two Fairbanks Morse marine oil engines of 100 horse power each, and built in accordance with the plans and specifications approved by and now in the possession of Lloyd's Register of Shipping and under the inspection of said Lloyd's Register. The Builder shall furnish the Purchaser a certificate of class of said schooner of highest class for this type of vessel of Lloyd's Register of Shipping at the time of delivery of said vessel. The said schooner shall be delivered to the Purchaser completely equipped and ready for sea at Biloxi or Gulfport, Mississippi, at Builder's option, not later than March 15, 1918, unless prevented by strikes," etc.

Section II of the contract reads as follows:

" The Purchaser shall have the right to make any additions to or changes in the plans not substantially affecting the subject-matter of this contract and not delaying the delivery of the vessel as hereinbefore provided on giving due notice in writing to the Builder, and provided that the cost of any such changes shall be added to or deducted from the contract price according to the fair valuation thereof, and the increased or deducted cost resulting from such changes shall be adjusted and agreed to in writing before any changes shall be made."

Section VIII of the contract reads as follows:

" The Purchaser and its representative shall have the right to inspect the schooner and materials assembled therefor and used thereon at all times during the construction and equipment of said schooner, and shall also have access to the yards and premises of the Seller with

full liberty to examine both material and workmanship and for that purpose the Purchaser shall have the right to appoint a competent inspector who shall at all times have the right to examine the workmanship upon and materials assembled for the construction and equipment of said schooner."

The purchase price of the schooner was to be $145 per English deadweight ton, gold coin of the United States of America.

The plaintiff, the Mississippi Shipbuilding Corporation, commenced the construction of the vessel at its yards in Biloxi, Mississippi, and completed it in August, 1918. Pursuant to section VIII of the contract above quoted, the purchaser sent a Captain Kerr to Biloxi to supervise the work in its behalf. J. M. Buchanan of the city of New Orleans was a surveyor for Lloyd's Register of Shipping who also at various times inspected the construction of the vessel to see that the work complied with the rules and regulations of the society. It was upon this report that the final certificate of Lloyd's Register was to be issued. An engineer, named Lodder, was also sent to Biloxi to work with Captain Kerr.

The vessel put to sea on September 3d, 1918, upon its maiden voyage which proved disastrous. The engines failed to work properly and heated to such an extent that they could not be used. The vessel sprang a leak and took in so much water that when out a few hundred miles on the Pacific the crew unanimously refused to proceed further, and Captain Kerr had to put back to Balboa. Later the schooner was taken to Mobile and submitted to extensive repairs in order to make her seaworthy and fit for use.

In the meantime, plaintiff had commenced this action for the balance claimed to be due it under the contract for the purchase price, to wit, $43,230, and for the cost and value of extra and additional work and material furnished amounting to $67,361.28, making a total of

$110,591.28. The defendant in addition to its denials set up a counterclaim for defective construction and for damages suffered in consequence thereof in the sum of $400,000.

When I speak of the defendant, I refer to either the Lever Brothers Company or the Lever Transportation Company, as both are the same for the purpose of this opinion. Another contract was entered into on the 20th of May, 1918, with the Lever Transportation Company which took over the contract of the Lever Brothers Company and undertook to carry out its terms and obligations. By this later contract, the time of performance was extended to June 1, 1918. As I view it, this fact has no bearing upon the matters which I am about to discuss.

When the case came on for trial it appeared that there had been many changes made at the suggestion of the owner in the construction of the vessel and many extras ordered in accordance with the terms and conditions of the contract. For the purposes of this case, W. H. Woolner, the agent and attorney in fact of the Lever Brothers Company or the Lever Transportation Company, was or would be considered the purchaser and owner, and directions, changes and extras ordered by him or with his knowledge and consent would be binding upon the defendant.

The contract, it will be noted by the provisions above quoted, required that any changes in the plans or specifications for the building of the ship in accordance with Lloyd's Register of Shipping should be made in writing. Neither Captain Kerr, Buchanan nor the engineer Lodder had authority to change in any substantial way the plans of the vessel. This was fully understood by the parties.

On February 26, 1918, the plaintiff wrote to W. H. Woolner, as follows:

" We fully understand the stand you take with regard to contemplated changes in the vessel, and will proceed

to institute changes only upon written recommendation from your office."

Mr. Dwyer, the president of the plaintiff company, testified that Mr. Woolner at the very beginning said to him:

" Mr. Dwyer, the contract calls for us to have a man on the job there to look after the work. Now, I cannot go there; my business is in Cambridge, Massachusetts, and I cannot go down to Mississippi to look after this work. I have designated Captain Kerr, the man who is down there now, and who inspected the vessel to act for me and to be on the job there from now on until this vessel is finished, to look after the construction of the work and pass on the material and to act on my behalf, and in addition to him we are sending down the engineer of the vessel to work with Captain Kerr to look after the construction of the boat and see that the plans and so forth are carried out as called for."

The kind of supervision that Kerr and Buchanan had over the work is well indicated by Mr. Dwyer in testifying that Woolner said:

" I have given Captain Kerr instructions to act in co-operation with Lloyd's man, Mr. Buchanan, and they will act together and take their orders from Mr. Buchanan. When Mr. Buchanan is not there he will transmit his orders to Kerr and Lodder, and in turn you will take your orders from them; whatever they say goes. If they want changes, if they want a certain piece of material taken out; if they won't pass on it, it is the same as if I was there; if they say you cannot do a certain thing and object to it, you will have to be guided by what they say."

From this it is apparent that Kerr and Buchanan had supervision over the class and kind of work that was being done and the material furnished and not any authority or power to materially change the plans and specifications in the work of constructing the vessel. That Dwyer understood the necessity of having a writing

**8** Mississippi Shipbuilding Corp. *v.* Lever Bros. Co.

[237 N. Y. 1] Opinion, per Crane, J. [Nov.,

to cover the material changes is evidenced by his testimony in which he said:

" I asked Mr. Woolner what he heard from Captain Kerr regarding these changes he wanted. My brother who was at the plant had written me several times that Kerr wanted this and wanted that, I wanted to know from Woolner what changes he wanted. The contract called for the changes in writing and I wanted to get them so I could go ahead and make them, as it was not getting late and it would cost a great deal more to make them at a later date."

Frequently Mr. Dwyer's testimony refers to the necessity of procuring a writing for changes and Woolner's promise to send him letters directing the making of the proposed or required changes. We, therefore, come to the point where we can say in viewing this contract and the work done under it that Woolner represented the defendants and had authority to direct changes or to waive that provision of the contract requiring a writing for the changes. Captain Kerr, Buchanan and Lodder had no authority to make, direct or to order any substantial or material changes.

The cross section plan of the schooner, *Elizabeth Ruth,* and the edge bolting plan as approved by Lloyd's called for the ceiling or sides of the ship to be edge bolted. These plans were Exhibit D-1 and Exhibit D-6 in the case. The plaintiff's president explained edge bolting as follows:

" Edge bolting is the bolting of the ceiling, which is the inside skin of the ship, by the bolts from the top right down through the ceiling. All fastening is important."

In order to save time and some other difficulties this was omitted and a different kind of fastening substituted. Again Dwyer testified:

" Instead of putting these edge bolts in, they stop where they were at the time of the edge bolting and put

through bolts through the ceiling all the way through the frame, clinch them on the outside of the frame and clinch them on the inside of the ceiling. Now, by clinching, I mean using malleable iron galvanized washers about as wide as my two fingers and about as thick as my finger. These were put over the head of the bolts and with a pneumatic hammer hitting about a thousand blows a minute, the head is fastened over this washer."

No written authorization or direction was given for this change. The change was extremely important and very substantial. The defendant's witnesses testified that the leaking of the ship resulting in the disaster at sea was due to the absence of this edge bolting. All or much of the expense to which the defendant was put in order to make the vessel seaworthy was caused by this change in the plans.

Who authorized this modification? Dwyer says Kerr authorized it and Buchanan acquiesced. Woolner says that he knew nothing about it. Buchanan denies that he ever gave his permission to such a change.

We have a situation thus far presented where the plans and specifications called for edge bolting. Edge bolting was omitted without the written authorization of the defendants. In this particular the plans were departed from in a very material and substantial respect which caused much damage to the defendant. What would be the legal situation and the right of the parties under these conditions? The Appellate Division was of the opinion that as the plans had not been followed, the plaintiff could not recover anything for its work and services under the contract or for its large amount of extra work and material furnished. This no doubt would be the law if the defendant had rejected the ship and had returned it to the plaintiff. The fact is the defendant accepted the ship and still has it in its possession. Under these circumstances it cannot keep the ship and refuse to pay the plaintiff the balance due it over and above the damage sustained.

Section 130 of the Personal Property Law (Cons. Laws, ch. 41) says:

" In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know, of such breach, the seller shall not be liable therefor."

The defendant was, therefore, required to give notice. This action was commenced February 6, 1919. Defendant served its answer on March 12, 1919. The vessel set out upon its voyage in September of 1918 and returned after its disastrous attempts to make a voyage in March of 1919, when upon examination the absence of the edge bolting and the other alleged defects and departures were discovered. The service of the answer and the bill of particulars calling attention to the absence of the edge bolting was sufficient notice of a breach of the plaintiff's warranty within this provision of the Personal Property Law, provided that the first knowledge that the defendant had of the defective and faulty work was upon the return and examination of the ship. But was this the first time it had knowledge of the omission of edge bolting? Captain Kerr was its servant and agent to watch the building of the vessel, to see that the plans were complied with and the edge bolting used in accordance with the drawings and specifications. Did he know that there was this change made in the work? Was his knowledge the knowledge of the defendant? Kerr was not called as a witness. Buchanan swears he did not know of the omission and so does Woolner. If Kerr knew all about it and attempted to authorize it, his knowledge might be that of the defendant, and then the reasonableness of the time in which to notify the plaintiff of its breach of

warranty might be a different question. We suggest these matters without attempting to decide them, as we cannot tell what the evidence may be in a new trial. Kerr may appear as a witness. The point has not been briefed or argued.

The Appellate Division, therefore, in this case were in error in dismissing this complaint. As above stated, the defendant by accepting the ship and failing to return it had a right to sue for the damages occasioned by departures from the plans and specifications upon giving the required notice. These damages could be offset against the plaintiff's claim under his contract for the work which was performed and for the extras furnished. The rule does not apply as strictly regarding personal property as it does regarding real property. When buildings have been constructed upon real estate as the owner cannot return the buildings he may keep them and refuse to pay the contract price if there has been a breach. Personal property, however, like a ship (*Rivara* v. *Stewart & Co.*, 236 N. Y. 601) can be rejected or returned or its acceptance refused. (*Cawley* v. *Weiner*, 236 N. Y. 357; *Mack* v. *Snell*, 140 N. Y. 193; *Spence* v. *Ham*, 27 App. Div. 379, 382.) Where this is not done, the purchaser must pay the contract price unless he gives notice of a breach of warranty in the contract. Upon giving such notice he has his claim for damage which may be prosecuted by action or set up as a counterclaim when sued for the price. This being the law, the plaintiff did not have to allege in its complaint a waiver but could have sued for its contract price. This it could have recovered if there had been no notice of the breach of any promise or warranty given within a reasonable time after the defendant knew of it.

It attempted, however, to set forth in its complaint a waiver. No doubt it had in mind a waiver as to the time of performance, there being penalties attached for delays. It stated as the cause of the delay the changes which had

**12** Mississippi Shipbuilding Corp. *v.* Lever Bros. Co.

[237 N. Y. 1] Opinion, per Crane, J. [Nov.,

been required by the defendant. The plans, the complaint said, had been changed and the performance of all the requirements waived by the defendant. These changes caused delay. We think these allegations were sufficient to enable the plaintiff to prove a waiver of the plans as stated in the bill of particulars and also prove that the defendant or its authorized agent had changed the edge bolting to clinch bolting. We do not agree with the Appellate Division that the pleading of this particular was insufficient. We think it was broad enough to cover the subject in point. The difficulty, however, remains that according to the proof the plaintiff was unable to show a waiver of the edge bolting as neither Kerr nor Buchanan had authority to make this change. In fact, the judge in his charge to the jury instructed them that neither Kerr nor Buchanan had authority to waive this provision of the contract.

The Appellate Division reversed this case upon questions of law, dismissing the complaint. As they were in error as to the law, for the reasons above stated, we would be required to reinstate the verdict for the plaintiff if it were not for errors which would have necessitated a reversal anyhow and a new trial.

That the absence of edge bolting caused the leak was strongly contested. It was claimed by the plaintiff that the ship had been loaded with caustic soda, that this was improperly loaded, that it escaped and caused all the damage to the ship. Some witnesses saw the effects of the soda discharged in the pumping, others denied that any caustic soda escaped at all. Captain Kerr was in charge of the vessel. He was not a witness. Buchanan was asked, however, if in a talk he had had with Captain Kerr the captain had not admitted that caustic soda caused the damage. The matter thus appears:

" Q. I will stand correction, whatever the date may be, if I am wrong, whatever date it was, I have here the 19th, you had a talk with Captain Kerr? A. Yes. Q.

In reference to the leaking of the schooner? A. Yes. Q. And in order to make your survey at that time you wanted to get as much information as you could, outside of your own knowledge? A. Yes. Q. Did Mr. Kerr and this engineer, Mr. Lodder, tell you that the vessel leaked by reason of the caustic soda? What is your answer to that? A. They told me that the vessel had leaked considerably on her initial voyage and that they had pumped a great deal of caustic soda in solution through the pump."

This evidence was clearly hearsay. The exception to the ruling admitting it presents reversible error.

The judgment should be reversed and a new trial ordered, with costs to abide the event.

HOGAN, CARDOZO, POUND, MCLAUGHLIN and ANDREWS, JJ., concur; HISCOCK, Ch. J., absent.

Judgment reversed, etc.